# UNITED STATES AIR FORCE COURT OF CRIMINAL APPEALS

## UNITED STATES

### v.

## Second Lieutenant CHARLES L. ALLEN
## United States Air Force

## ACM 38159

## 28 March 2014

Sentence adjudged 7 March 2012 by GCM convened at Davis-Monthan Air Force Base, Arizona.  Military Judge:  William C. Muldoon.

Approved Sentence:  Dismissal, confinement for 5 years, and a reprimand.

Appellate Counsel for the Appellant:  Frank J. Spinner, Esquire (argued) and Major Matthew T. King.

Appellate Counsel for the United States:  Captain Matthew J. Neil (argued); Colonel Don M. Christensen; Lieutenant Colonel C. Taylor Smith; and Gerald R. Bruce, Esquire.

Before

ORR, HARNEY, and MITCHELL
Appellate Military Judges

OPINION OF THE COURT

This opinion is subject to editorial correction before final release.

MITCHELL, Judge:

The appellant was a 24-year-old officer who, at the time of his court-martial, had two years of service and was assigned to the Maintenance Operations Squadron at Davis-Monthan Air Force Base (AFB), Arizona.  Contrary to his pleas, a general court-martial composed of officer members found the appellant guilty of two specifications of wrongful sexual contact; two specifications of aggravated sexual contact; one specification of aggravated sexual assault by causing bodily harm;  two specifications of conduct unbecoming an officer by developing and maintaining inappropriate

relationships (one with a 17-year-old civilian, AP, and one with Airman (Amn) JC[1]); and one specification of giving a false official statement, in violation of Articles 120, 133, and 107, UCMJ, 10 U.S.C. §§ 920, 933, 907.[2] The adjudged and approved sentence was a dismissal, 5 years of confinement, and a reprimand.

The appellant avers seven errors: (1) The evidence is legally and factually insufficient to support the findings with respect to the Articles 120 and 133, UCMJ, Specifications; (2) The military judge erred when he excluded evidence related to CS as not constitutionally required under Mil. R. Evid. 412; (3) The Article 107, UCMJ, conviction is legally and factually insufficient; (4) The military judge erred by not suppressing evidence recovered from the appellant's mobile device; (5) The military judge erred when he read the Government's requested sentencing instruction; (6) The military judge erred in calculating pretrial confinement credit; and (7) The record of trial is not substantially verbatim as it is missing two appellate exhibits. We heard oral argument on the first two alleged errors on 4 February 2014.[3]

We agree that the Article 107, UCMJ, conviction for giving a false official statement is legally and factually insufficient and set aside that offense. We disagree with the appellant on all the other issues. We reassess the sentence and affirm the approved sentence.

*Legal and Factual Sufficiency*

We review issues of factual sufficiency de novo. Article 66(c), UCMJ, 10 U.S.C. § 866(c); *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002). The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are] convinced of the accused's guilt beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987). In conducting this unique appellate role, we take "a fresh, impartial look at the evidence," applying "neither a presumption of innocence nor a presumption of guilt" to "make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt." *Washington*, 57 M.J. at 399.

The test for legal sufficiency of the evidence is "whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt." *Turner*, 25 M.J. at 324. "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*,

---

[1] Airman JC was an Airman Basic at the time she met the appellant.

[2] The appellant was found not guilty of other specifications alleging violations of Articles 80, 120, and 133, UCMJ, 10 U.S.C. §§ 880, 920, 933.

[3] Senior Judge Orr took part in the oral argument and this opinion prior to his retirement.

56 M.J. 131, 134 (C.A.A.F. 2001) (citing *United States v. Rogers*, 54 M.J. 244, 246 (C.A.A.F. 2000)).

The appellant contends his convictions in violation of Articles 120 and 133, UCMJ, were legally and factually insufficient. We discuss each in turn below.

### 1. CS, Article 120, UCMJ, Allegation

CS was the named victim of two Article 120, UCMJ, specifications. The appellant was convicted of grabbing CS's breasts with strength sufficient that she could not avoid or escape the contact, and grabbing her breasts and rubbing her genitalia with his genitalia without permission. The appellant argues CS is not credible because she lied under oath and cannot corroborate her claims with physical injury. Moreover, he argues he received sexually suggestive text messages from her prior to meeting in person, which explained his state of mind.

At trial, CS recounted meeting the appellant on a social website and exchanging sexually suggestive text messages. The appellant attempted to schedule a rendezvous, but CS avoided it. She eventually told him by text message: "[I]f [you] stop thinking we were going to f[**]k, we could chill." She and the appellant eventually met in person and went to his lodging room to watch television. There, she testified, the appellant began kissing her and rolled on top of her. She attempted to push him away and told him "no," but he continued to kiss her. He then grabbed her breast through her shirt. She grabbed his hand to pull it away, but he pulled his hand from her grip and put his hand down her shirt and grabbed her breast again. She continued to struggle and say no. He then exposed his penis and began grinding his hips into her hips. After the appellant finally relented, CS left the room and while crying called a friend. She reported the assault to security forces (SFS) later that night.

We are not persuaded that lack of visible physical injury to CS means her testimony is not credible, as the appellant argues. Her testimony clearly described a struggle between her and the appellant. The lack of physical injury is relevant, but does not equate with a conclusion that her testimony is not sufficiently compelling to establish proof beyond a reasonable doubt. Likewise, references to prior text messages are relevant but not controlling. Although she admitted suggestive text messages had been exchanged, her actions and words at the time of the assault clearly and unambiguously indicate her lack of consent.

At trial, CS testified she reported the incident to SFS and showed an SFS member the text messages. She further testified the SFS member told her to delete the text messages. At trial, the SFS member who took her statement in January 2010 testified that she would not show him the text messages and that he did not advise her to delete the messages. He further testified that SFS members are trained to preserve evidence and to

his knowledge none of his subordinates advised her to delete the messages. We agree that this inconsistency is relevant in determining the credibility of this witness; we disagree that it requires us to find that her testimony is legally and factually insufficient.

After applying the test for legal sufficiency and viewing the evidence in the light most favorable to the prosecution, we conclude the evidence is legally sufficient. Additionally, taking a fresh, impartial look at the evidence in the record and making allowances for not having personally observed the witnesses, we find the evidence factually sufficient beyond a reasonable doubt.

### 2. SC, Article 120, UCMJ, Allegations

The appellant avers the two specifications that name SC as the victim were legally and factually insufficient because there were too many problems with her story. He argues that during the incident, he was receiving "mixed messages" from SC and that she never reported the incident until she was contacted by prosecutors, and therefore her story might be embellished. The appellant was convicted of forcing SC's face to his penis without her permission and forcing her face to contact his penis with strength sufficient that she could not avoid or escape the sexual contact, in violation of Article 120, UCMJ.

At trial, SC testified that she and the appellant met on a dating website, exchanged telephone numbers, and began to chat over text messages. They met in person at a local pool before returning to SC's apartment. When they first met, he grabbed her butt; she asked him why he did that and he explained it was because she was "so hot." At SC's apartment, they began to kiss and cuddle on a small couch. On about three different occasions the appellant grabbed her breast, but each time she pulled his hand away. Eventually, she got up "to cool things off" and went into the kitchen. When she returned, the appellant had pulled his shorts down and exposed his penis. She told him, "in a firm and kind of demanding way," to put it away. He complied and she sat down next to him. She testified that within seconds he exposed his penis again, grabbed her head, and forced it towards his penis, telling her to suck it. Her forehead made contact with his penis before she was able to pull away. He then grabbed her head again and forced it back down to make contact with his penis again. She then pulled away and told him he had to leave, which he did. She never reported the incident to the dating website or civilian or military authorities.

We find the appellant's arguments lacking. SC's failure to report the incident to authorities is more appropriately argued as extenuation. It is by no means an indicator of the veracity of her testimony. Moreover, while the appellant questions whether her perception of the event has changed because she was contacted by the prosecution, there is no evidence to support this. In fact, the appellant relies solely on conjecture to argue this error.

We finally note the appellant's allegation that he received mixed messages from SC and that "'no' does not mean no, it means maybe something, later." He argues he was receiving mixed signals because after SC told him to put away his erect penis she did not turn on the light or ask him to leave, but instead she sat down next to him. We find this argument meritless. While he and SC engaged in consensual behavior typical of dating adults, the exposure of his penis was clearly unwanted. Simply sitting down next to the appellant and not kicking him out of her apartment was not a conflicting signal. We are firmly convinced of the appellant's guilt beyond a reasonable doubt and find the evidence is both legally and factually sufficient.

### 3. JS, Article 120, UCMJ, Allegation

The appellant was convicted of causing JS to engage in a sexual act by penetrating her genital opening with his finger, using strength sufficient that she could not avoid or escape the sexual contact, in violation of Article 120, UCMJ. He argues JS's testimony indicated she did not object to penetration at the time, but only later when it began to be uncomfortable. He questions whether that amounts to a UCMJ offense. Furthermore, he argues that the next day JS did not report the incident herself, but her father reported for her.

JS testified that she met the appellant at a mutual friend's apartment after a night of drinking. She and the appellant left the party on an errand to his apartment. There, they watched television and began kissing, with her body propped up on his lap. She eventually straddled him. When the kissing became too aggressive, she broke it off and told him so. They then returned to her friend's apartment, but the door was locked. The appellant then picked her up, slung her over his shoulder, and carried her back to his apartment. She told him to put her down, but he did not comply. At the apartment for the second time, she used the bathroom. When she exited, she saw him in just his boxers. She believed that "something" (sexual) was going to happen at this time. They began to kiss and found their way to his bed. He then put his hand up her skirt and digitally penetrated her. She testified that it was "painful. It felt like he was scratching [her] and just like ripping [her] down there." She stated she immediately told him to stop several times but he did not. She was confident he heard or should have heard her, but he was "in a zone." She tried to pull away but was unable. He then stopped and attempted to penetrate her with his penis. At this time, she was able to pull away from him, push him off with her shins, and run out. She noted she had to push him with all of the force she could.

The appellant's argument is lacking, as the evidence presented at trial showed JS told him the touching was unwanted and struggled against him. JS immediately told a friend about the assault, who observed she was upset. The next day JS was vomiting and had blood in her underwear. She told her father what had happened. She went to the hospital for possible alcohol complications, and reported the sexual assault. At that time

a sexual assault examination was completed, which found lacerations consistent with digital penetration. We find this specification legally and factually sufficient.

## 4. AP, Article 133, UCMJ, Allegation

The appellant was convicted of sending images of his exposed genitalia to AP, a 17-year-old high school student which, under the circumstances, was conduct unbecoming an officer, in violation of Article 133, UCMJ. As he argued at trial, the appellant maintains that sending graphic sexual images, under the facts presented at trial, was not sufficient evidence for a UCMJ offense.

At trial, AP testified that she was 17 years old when she met the appellant on a dating website, although her profile stated she was 18 years old. She and the appellant began to chat over text messages, but she did not remember discussing her age with the appellant while he was pursuing her. The Government introduced the contact list retrieved from the appellant's phone, and AP identified her number assigned to the contact name "17." No one else used that nickname for her. The appellant asked her to meet him at his place and have sex in his hot tub. He also sent pictures of himself in boxer briefs and his exposed penis, which she received while she was at school, and a teacher saw the image.

We are unmoved by the appellant's argument. The two elements (1) the accused did a certain thing, and (2) under the circumstances it constituted conduct unbecoming an officer and gentleman, are met. *Manual for Courts-Martial, United States* (*MCM*), Part IV, ¶ 59.b. (2008 ed.). The *Manual* provides examples of Article 133, UCMJ, offenses, such as crimes involving moral turpitude or dishonoring or disgracing the officer due to indecency or indecorum. *MCM*, Part IV, 59.c.(2). The appellant's actions fall squarely within these examples. The evidence shows the appellant knew AP was underage but sent her graphic pictures of his exposed penis. The surrounding circumstances show those pictures were unwanted, as were his invitations for her to have sex with him in his hot tub. Furthermore, the image was sent to AP while she was at school and was viewed by a high school teacher. Although the appellant argues this is often the social norm for teenagers, that does not therefore make it the norm expected of an officer. We are convinced of the appellant's guilt and believe a reasonable factfinder could have found all elements met by the evidence presented at trial.

## 5. Amn JC, Article 133, UCMJ, Allegation

The appellant argues that although he and Amn JC, a reservist, exchanged sexually explicit text messages, that did not rise to an offense under the UCMJ, because it is a common occurrence among their age group. He further argues there is no evidence to show "how many text messages were exchanged when she was just in duty status." He

was convicted of sending nude images of his genitalia to Amn JC which conduct, under the circumstances, was unbecoming an officer.

At trial now-Senior Airman (SrA) JC testified that she had been assigned to a reserve unit in Westover, Massachusetts, for two years prior to the court-martial. She met the appellant at Keesler AFB, Mississippi, over the 4 July 2010 weekend while she was on active duty for training. At that time, she was an Airman Basic. They exchanged phone numbers and began to converse over text message. During this time, SrA JC discussed military life with the appellant, as well as her intentions of possibly becoming an officer. At some point, she communicated to him that she was an E-1 who was soon to be promoted to E-2. SrA JC also explained that during their texting the appellant asked about the possibility of her visiting him once her technical school ended. The conversations also became sexual and the appellant and SrA JC eventually exchanged nude pictures. The Government introduced data from the appellant's phone, which includes text conversations between the appellant and SrA JC where she refers to him as "sir" and asks if he has any hot "officer friends" for her female friend. That conversation occurred while SrA JC was on active duty at technical school.

The evidence adduced at trial shows the appellant was aware SrA JC was enlisted while they carried on a text "relationship" and continued to exchange sexually explicit text messages. SrA JC testified at trial that she was not offended by the messages, but that is not the gravamen of this offense, and neither is the quantity of messages exchanged while SrA JC was on active duty. The evidence sufficiently shows the appellant's actions "based on customs of the service and military necessity," fall below that expected of an officer. *MCM*, Part IV, ¶ 59.c.(2). We again consider all the evidence and find this specification legally and factually sufficient.

*Military Judge's Ruling on Mil. R. Evid. 412*

CS testified that she had been sexually assaulted by two military members before the appellant assaulted her, and another military member assaulted her afterwards. CS did not pursue charges in the other three cases. CS also had an online journal (blog). In her blog, she wrote that she had recurring nightmares of being sexually assaulted or raped and that she had these nightmares prior to the assaults. Trial defense counsel sought to admit this evidence, and a closed Article 39(a), UCMJ, 10 U.S.C. § 839(a), hearing was held pursuant to Mil. R. Evid. 412. CS testified at the hearing. The military judge made detailed findings of fact and concluded the evidence was not vital to the defense. The military judge denied the defense motion to admit the evidence.

"We review the military judge's ruling on whether to exclude evidence pursuant to [Mil. R. Evid.] 412 for an abuse of discretion. Findings of fact are reviewed under a clearly erroneous standard and conclusions of law are reviewed de novo." *United States v. Ellerbrock*, 70 M.J. 314, 317 (C.A.A.F. 2011) (citing *United States v. Roberts*,

69 M.J. 23, 26 (C.A.A.F. 2010)). The military judge's findings of fact are not clearly erroneous. Therefore, we adopt these facts as our own and incorporate them into this opinion.

As a general rule, evidence of a victim's past sexual behavior is inadmissible in a case involving an alleged sex offense. *See* Mil. R. Evid. 412. "Evidence offered to prove that any alleged victim engaged in other sexual behavior" is "not admissible in any proceeding involving an alleged sexual offense except as provided in [Mil. R. Evid. 412] subdivisions (b) and (c)." Mil. R. Evid. 412(a). Subdivision (b) provides three exceptions to this general rule of exclusion. The third of these exceptions, the "constitutionally required exception," permits the admission of "evidence the exclusion of which would violate the constitutional rights of the accused." Mil. R. Evid. 412(b)(1)(C).

Evidence may be admitted under Mil. R. Evid. 403 when the evidence is relevant, material, and its probative value outweighs the dangers of unfair prejudice. *See also* Mil. R. Evid. 402; *United States v. Gaddis*, 70 M.J. 248, 254-55 (C.A.A.F. 2011). Relevant evidence is any evidence that has "any tendency to make the existence of any fact . . . more probable or less probable than it would be without the evidence." Mil. R. Evid. 401. The evidence must also be material, which requires looking at "'the importance of the issue for which the evidence was offered in relation to the other issues in th[e] case; the extent to which th[e] issue is in dispute; and the nature of the other evidence in the case pertaining to th[at] issue.'" *United States v. Banker*, 60 M.J. 216, 222 (alterations in the original) (quoting *United States v. Colon-Angueira*, 16 M.J. 20, 26 (C.M.A. 1983)).

If the military judge, after applying the Mil. R. Evid. 403 balancing test, finds the probative value of the evidence outweighs the danger of unfair prejudice, "it is admissible no matter how embarrassing it might be to the alleged victim." *Gaddis*, 70 M.J. at 256. "Reasonable limits on cross-examination intended to attack a witness's credibility may be based on concerns such as harassment, prejudice, confusion of the issues, witness safety, repetitiveness, or marginal relevancy." *United States v. Velez*, 48 M.J. 220, 226 (C.A.A.F. 1998) (citing *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)). Likewise, if a military judge determines the evidence is not constitutionally required, the military judge must exclude the evidence under Mil. R. Evid. 412 because the evidence does not fall under an exception to the rule of exclusion. *Gaddis*, 70 M.J. at 256.

In *Velez*, our superior court upheld a military judge's decision to suppress evidence that the victim in that case made a prior complaint of rape against another Marine: "The mere filing of a complaint is not even probative of the truthfulness or untruthfulness of the complaint filed. Thus, its relevance on the question of credibility of a different complaint in an unrelated case, such as appellant's, entirely escapes us." 48 M.J. at 227 (internal citations omitted). Here however, CS was determined to be

"substantially unreliable in the previous [] sexual assault allegation in which she reported [a different military member] raped her." We are not convinced that a history of a prior questionable report of a sexual assault has any more bearing on the credibility of a witness. In *United States v. Bahr*, 33 M.J. 229, 234 (C.M.A. 1991), our superior court found error when the military judge barred cross-examination of the victim regarding a "prior false rape claim" when the defense theory of admissibility was that the false claim showed the victim had a motive to testify falsely to call attention to herself. The defense theory in this case is not as coherent. Both at the trial level and on appeal, the appellant argues the prior complaints of sexual assault are relevant to the victim's perception, recall, and bias. However, the defense has not offered any support for this theory. Our superior court examined a similar broad rationale proffered for the admission of a prior claim of rape and rejected it. *See United States v. Sojfer*, 47 M.J. 425 (C.A.A.F. 1998). Similarly, we do not see how the evidence of other allegations of sexual assault is relevant or admissible in this appellant's case. We hold the military judge did not abuse his discretion in excluding this evidence.

Trial defense counsel also sought to admit the evidence of CS's blog entries and testimony regarding her recurring nightmares as evidence of her lack of credibility and ability to perceive. Trial defense counsel repeatedly labelled her dreams as premonitions, but CS steadfastly denied this characterization. CS testified the nightmares did not have a lot of specificity but instead were "really vague all the time" and were focused on her trying to get away, albeit unsuccessfully. CS would also have nightmares about the sexual assaults after they occurred. CS had nightmares about a week prior the assault by the appellant. The military judge found:

> [CS] testified that she had recurrent nightmares about being sexually assaulted or raped. On three occasions she had nightmares about being raped or sexually assaulted before such events actually happened. Other than the fact that the nightmares involved rape or sexual assault, there was nothing about the nightmares that was similar to the events that then transpired in real life. After the events she would have nightmares reliving the incidents.

The military judge also found the defense failed to present any evidence that showed how the nightmares would have impacted her ability to perceive.

The military judge's findings of fact are not clearly erroneous. We agree with the military judge that the evidence of the nightmares was, at best, minimally relevant to the allegation and was neither material nor vital to the defense. Trial defense counsel argued the nightmares diminished her credibility because no one who had such nightmares would place themselves in situations where the nightmares could become reality. The argument was essentially that the nightmares predisposed CS into perceiving consensual activity as non-consensual. It is improbable that the victim misinterpreted the appellant's

rubbing his penis against her after she had repeatedly said no as an indecent assault rather than as consensual sexual activity. *See Sojfer*, 47 M.J. at 428. Moreover, CS testified she had engaged in consensual sexual activity during the time in which she was having nightmares; therefore she did not perceive every sexual interaction to be coercive. Furthermore, her nightmares regarding the prior sexual assaults are not admissible for the same reasons that the sexual assaults themselves are not admissible as set forth above.

*False Official Statement*

The appellant was convicted of making a false official statement to Detective (Det.) DH with the Tucson Police Department. Det. DH received a report of an alleged sexual assault of JS by the appellant.[4] On 11 August 2011, he interviewed the appellant regarding the offenses. During the interview, the appellant wore his Airman Battle Uniform (ABUs). The interview occurred off-base and there is no evidence that Det. DH coordinated with any military official prior to the interview. When the appellant asked if he needed to call the base or if Det. DH would, the detective responded, "It's entirely up to you. I don't have an obligation to my knowledge, to notify your commander." Det. DH also explained that all the evidence would be forwarded to the county attorney's office for a decision on whether or not to prosecute the allegation. During the interview, the appellant was asked if he had ever been accused of anything like this before, and he answered, "Never, never, like violating somebody or jumping on somebody's -- I'm not (laughs), I'm not a bad person Sir -- and this sounds horrible." By the time of this interview, the appellant had received preferred charges alleging wrongful sexual contact with four different victims.[5]

In *United States v. Capel*, 71 M.J. 485 (C.A.A.F. 2013), and *United States v. Spicer*, 71 M.J. 470 (C.A.A.F. 2013), our superior court provided a framework to use when determining if a statement is "official" for the purposes of Article 107, UCMJ. In order for a statement to be "official" it must fall into one of three categories: (1) The statement is made "in the line of duty, or to civilian law enforcement officials if the statement bears a clear and direct relationship to the speaker's official duties"; (2) The "hearer is a military member carrying out a military duty at the time the statement is made"; or (3) The "hearer is a civilian who is performing a military function at the time

---

[4] This allegation was later referred to the court-martial. The appellant was acquitted of the attempted rape of JS and rape by using strength against JS; he was convicted of aggravated sexual assault by causing bodily harm to JS, in violation of Article 120, UCMJ, 10 U.S.C. § 920.

[5] The original court-martial charges were preferred on 3 March 2011 and received by the appellant on that same day. The original charges included three specifications alleging a violation of Article 120, UCMJ, for wrongful sexual contact with HO, CS, and SC. These charges were referred on 17 June 2011. An additional charge was preferred on 1 June 2011 and served on the appellant that same day. These charges included seven specifications under Article 120, UCMJ, including wrongful sexual contact with TC; aggravated sexual contact with HO, CS, SC, and TC; and rape of TC. The Additional Charge was referred to the same court-martial as the original charges on 16 June 2011. Second, Third, and Fourth Additional Charges were later preferred and referred against the appellant, to include specifications in violation of Article 80, 107, and 120, UCMJ, 10 U.S.C. §§ 880, 907, 920.

the speaker makes the statement," *Spicer*, 71 M.J. at 474-75 (internal citations and quotation marks omitted), or is "acting on behalf of military authorities or . . . performing a military function." *Capel*, 71 M.J. at 487. Statements made to civilian law enforcement officials are not official statements under Article 107, UCMJ, when the statements are not pursuant to any military duties of the appellant, and the civilian police officers are not acting in conjunction with or on behalf of military authorities *at the time* the statements are made. *United States v. Passut*, 73 M.J. 27, 31 (C.A.A.F. 2014).

Although the results of the investigation were later forwarded to the military, there is no evidence that at the time of the statements Det. DH was acting in conjunction with or on behalf of the military. The evidence revealed it was a civilian law enforcement investigation at that time. The Government argues that because the appellant was in uniform and the statements were a denial of preferred court-martial charges, that the statement is necessarily part of the appellant's official duties. We are not persuaded that these factors are sufficient to establish that the statements are in the line of duty or bear a direct relationship to the appellant's official duties.[6] We therefore set aside the Third Additional Charge and its Specification, which alleged a violation of Article 107, UCMJ. We reassess the sentence below.

*Evidence from Appellant's BlackBerry Device*

The appellant argues the military judge erred when he denied the defense motion to suppress derivative evidence obtained from the appellant's BlackBerry device. A military judge's denial of a motion to suppress is reviewed for abuse of discretion; the "[f]indings of fact are affirmed unless clearly erroneous [or unsupported on the record]; conclusions of law are reviewed de novo." *United States v. Rader*, 65 M.J. 30, 32 (C.A.A.F. 2007). We consider the evidence "in the light most favorable to the prevailing party." *United States v. Reister*, 44 M.J. 409, 413 (C.A.A.F. 1996) (internal quotation marks omitted). "The abuse of discretion standard requires more than a mere difference of opinion; the decision must be arbitrary, clearly unreasonable, or clearly erroneous." *United States v. Wicks*, 73 M.J. 93, 98 (C.A.A.F. 2014) (citations and internal quotation marks omitted).

The military judge made the following findings of fact. On 10 September 2010, TC provided a sworn statement to the Air Force Office of Special Investigations (AFOSI) alleging the appellant had sexually assaulted her on two occasions on approximately 4 and 8 September 2010.[7] In her statement, she stated she met the appellant through a dating website and they exchanged text messages and made phone calls to each other. The appellant was brought to the on-base AFOSI detachment later that day. He invoked his right to remain silent, requested an attorney, and refused to provide consent for a

---

[6] We do note, however, these factors may have been sufficient to support a charge of conduct unbecoming an officer for lying to a civilian law enforcement officer, in violation of Article 133, UCMJ, 10 U.S.C. § 933.

[7] The appellant was acquitted of all the charges and specifications where TC was the alleged victim.

search of his cellphone and his person. AFOSI agents obtained a search authorization from Colonel DU, a base military magistrate, which was documented on an AF IMT 1176, *Authority to Search and Seize*. On this form, the magistrate gave the agents authority to search the appellant's person and to seize his "cellular phone." "While the form itself did not state that investigators could search the data on the cell phone, it was clear from their discussions that he authorized them to also search the data contained on the cell phone for evidence that would corroborate or refute the allegation made by [TC]." The AFOSI agents returned with the search authorization and presented it to the appellant who had remained in the AFOSI interview room since invoking his rights. The appellant stated he did not have his phone on him. One of the agents asked where the phone was and the appellant stated it was in his car. The AFOSI agent then said, "No problem, we can go get it," or words to that effect, and walked with the appellant out to his car. The appellant unlocked the car and provided the phone to the agent.

The appellant's mobile device was a BlackBerry. The military judge found that "[a] BlackBerry is not simply a cellular phone; it is a handheld computer with the capability of exchanging phone calls. The device can also store data, exchange text messages, send and receive instant messages and emails, access the internet and run programs."

After seizing the BlackBerry, AFOSI caused a digital copy to be made of certain data: the contact list and the call logs and text messages from 2 to 10 September 2010 (hereinafter "Cellebrite data"). The process used to extract the data "copie[d] the data requested into a Microsoft Excel spread sheet chronologically by each category requested." The Cellebrite data included the appellant's contact list and 1,400 text messages. An AFOSI Special Agent [SA] DC reviewed the Cellebrite data for information that would corroborate or refute the allegations of TC. During this review, SA DC found text messages that showed the appellant meeting women on social media websites and then exchanging sexually suggestive messages. With the contact list, AFOSI agents identified Amn JC and AP, as well as other alleged victims, SC and HO.

Without receiving further authorization from the base magistrate, on 10 December 2010, SA DC conducted another examination of the appellant's BlackBerry that exceeded the previously extracted data. SA DC specifically looked for photos on the appellant's phone. The search revealed the appellant had sent about 10 women photos of his genitals and that several women reciprocated by sending him sexually suggestive photos of themselves, to include photos of TC, AP, and a photo of Amn JC while she was scantily clad in ABUs.

In January and February 2011, members of the Davis-Monthan AFB legal office contacted the individuals discovered in the Cellebrite data obtained by AFOSI. Their purpose was to determine if others may have similar complaints against the appellant.

Through their phone calls, they identified SC and HO as other victims. "There was no prior investigation by any authority involving either [SC or HO and the appellant]."

The Government later obtained a computer forensic expert. The expert examined the Cellebrite data. The expert also independently analyzed the appellant's BlackBerry and accomplished a report that included "all communications recoverable from the [appellant's] device" at the Government's request.

Trial defense counsel filed a motion to suppress the BlackBerry and all derivative evidence. The military judge granted the motion in part. The military judge suppressed the evidence, such as the photographs, that was derived from AFOSI's 10 December 2010 search of the BlackBerry. He also suppressed the evidence derived from the forensic expert's subsequent search of the BlackBerry. The military judge determined that both of these searches exceeded the scope of the search authorization. He denied the motion as to the Cellebrite data and to the testimony of alleged victims found through that evidence. The military judge determined that the seizure of the BlackBerry was beyond the scope of the search authorization, because AFOSI questioned the appellant about the location of the device without providing him his Article 31, UCMJ, 10 U.S.C. § 831, rights, but that its discovery was inevitable. The military judge concluded the contact information was obtained pursuant to the search authority, the investigators were able to use that contact information to locate SC and HO, and they were permitted to testify. The military judge also found that although SA DC's search of the photos was beyond the scope of the search authorization, the contact list information and the text messages which were obtained pursuant to the search authorization had the information about Amn JC and AP. The military judge similarly determined that given the investigative steps to contact the individuals in the contact list, "it [was] inevitable that investigators would have eventually contacted both of these witnesses."

Based on the evidence in the record and implicit in the military judge's ruling, the appellant had a reasonable expectation of privacy in his BlackBerry. "[C]ell phones may not be searched without probable cause and a warrant unless the search and seizure falls within one of the recognized exceptions to the warrant requirement." *Wicks*, 73 M.J. at 99. The "inevitable discovery" exception applies when the routine practice and procedures of the law enforcement agents who possess or are actively pursuing evidence or leads would have inevitably led to the obtaining of the evidence in a lawful manner. *Id.* at 103 (quoting *United States v. Owens*, 51 M.J. 204 (C.A.A.F. 1999)). The military judge did not abuse his discretion when he determined the seizure of the BlackBerry was the result of inevitable discovery. The AFOSI agents had leads that the appellant had engaged in text messaging and phone calls with the alleged victim. The AFOSI agents, in obtaining the warrant, assumed the appellant had his cellphone on his person. When they realized their assumption was wrong, the AFOSI agents should have obtained a search warrant to search the appellant's car located on base for the cell phone. The military magistrate testified he would have authorized a search of the car to obtain

the cellphone because he determined there was probable cause to believe that the contents of the cellphone had evidence pertaining to the allegations made by TC. We agree that under the facts of this case the seizure of the cellphone from the appellant's car was outside the scope of the search authorization, but is allowed under the "inevitable discovery" exception.

The appellant argues the testimony of JC and AP should have been suppressed as derivative evidence of the illegal search by SA DC and his discovery of the photos. The military judge determined the contact information and some evidence of their involvement with the appellant were contained in the information that was properly obtained by the investigators (the Cellebrite data). The military judge therefore concluded that regardless of the illegal search of the photos, law enforcement investigators would have inevitably discovered JC and AP. The use of the exclusionary rule to prevent live-witness testimony is used with "greater reluctance"; the cost is higher in excluding live witness testimony as opposed to the suppression of an inanimate object. *United States v. Ceccolini*, 438 U.S. 268, 280 (1978). Here law enforcement was legally in possession of evidence that provided the contact information and proof of a relationship between the victims and the appellant. Evidence that is derived from an independent source falls within one of the limited exceptions to the exclusionary rule. *Wicks*, 73 M.J. at 103 (citing *United States v. Runyan*, 275 F.3d 449, 466 (5th Cir.)). The military judge did not abuse his discretion in determining AP and SC would have been inevitably discovered and that their in-court testimony was not prohibited by the exclusionary rule.

*Instruction that Sex Offender Registration is a Collateral Matter*

After the appellant mentioned sex offender registration in his unsworn statement, trial counsel proposed an instruction that such an issue was a collateral matter and not relevant. Trial defense counsel objected to the instruction "as drafted," but noted that with some "wordsmithing" the two sides "might be able to reach a middle ground." Shortly thereafter, the military judge recessed the court and instructed counsel to find him when they were ready to discuss the proposed instruction. If a Rule for Courts-Martial (R.C.M.) 802 conference was held, it was not summarized on the record.[8] The court resumed with the members, and the military judge gave a different instruction on sex offender registration as a collateral issue.[9] At the conclusion of all the instructions, trial

---

[8] "Occasionally it may be appropriate to resolve certain issues, in addition to routine or administrative matters [in a conference], if this can be done with the consent of the parties." Rule for Courts-Martial (R.C.M.) 802(a), Discussion.

[9] The instruction stated: "During the accused's unsworn statement, he alluded to the possibility of sex offender registration. Collateral consequences such as possible sex offender registration are separate concerns, not a part of your consideration in adjudging an appropriate sentence for this accused. You do not know the requirements for sex offender registration or its possible impact on the accused."

defense counsel did not object to the final instructions presented to the members.[10]

"We review a military judge's decision whether to instruct on a specific collateral consequence of a sentence for abuse of discretion." *United States v. Boyd*, 55 M.J. 217, 220 (C.A.A.F. 2001) (citing *United States v. Perry*, 48 M.J. 197, 199 (C.A.A.F. 1998)). The abuse of discretion standard is strict and involves "more than a mere difference of opinion–the challenged ruling must be 'arbitrary, fanciful, clearly unreasonable' or 'clearly erroneous.'" *United States v. McElhaney*, 54 M.J. 120, 132 (C.A.A.F. 2000) (quoting *United States v. Miller*, 46 M.J. 63, 65 (C.A.A.F. 1997); *United States v. Travers*, 25 M.J. 61, 62 (C.M.A. 1987)). As a general proposition, collateral consequences of a particular sentence are not relevant to a court-martial proceeding. *United States v. Quesinberry*, 31 C.M.R. 195, 198 (C.M.A. 1962) ("In sum, the rule which is applicable here is simply that precept which commands courts-martial to concern themselves with  the appropriateness of a particular sentence for an accused and his offense, without regard to the collateral administrative effects of the penalty under consideration.").

We have previously upheld a military judge's decision to prohibit trial defense counsel from arguing the effects of sex offender registration during sentencing argument, reasoning that sex offender registration was a collateral issue. *See United States v. Datavs*, 70 M.J. 595, 603-04 (A.F. Ct. Crim. App. 2011), *aff'd on other grounds*, 71 M.J. 420 (C.A.A.F. 2012). Subsequently, our superior court held that "in the context of a guilty plea inquiry, sex offender registration consequences can no longer be deemed a collateral consequence of the plea." *United States v. Riley*, 72 M.J. 115, 121 (C.A.A.F. 2013). We have since examined whether sex offender registration remains a collateral issue in sentencing and conclude again that it does. *See United States v. Lindsey*, ACM 37894 (A.F. Ct. Crim. App. 18 June 2013) (unpub. op.) ("[M]ilitary judge did not abuse her discretion in telling the panel they could not consider sex offender registration consequences when deciding what sentence was appropriate for the appellant and by prohibiting trial defense counsel from referencing sex offender registration in his argument."); *United States v. Martin*, ACM 38222, (A.F. Ct. Crim. App. 30 September 2013) ("[M]ilitary judge did not abuse his discretion in refusing to provide the defense-requested sex offender registration instruction because sex offender registration is not a matter in mitigation for purposes of sentencing proceedings."). Thus, the military judge did not abuse his substantial discretionary power in providing the requested instruction in this case.

---

[10] Nor did trial defense counsel raise any objection to the failure to summarize an R.C.M. 802 conference, if one was held.  Failure by a party to object at trial to a lack of an R.C.M. 802 conference summary waives the issue.  R.C.M. 802(b).

Trial defense counsel filed a motion for additional credit for alleged mistreatment of the appellant while in pretrial confinement, alleging violations of Article 13, UCMJ, 10 U.S.C. § 813. The military judge made the following findings of fact: The appellant "was not attending [religious] services weekly as a matter of practice" before he entered pretrial confinement. Upon entry into pretrial confinement, he asked confinement personnel if he could attend religious services. He went to a religious service on the fourth Sunday he was in confinement. An alleged victim, TC, who was in the Air Force at the time of the alleged assault, was also present at that same church service.[11] Afterwards, the confinement officer revoked the privileges of all confinees from attending religious services. The military judge determined that "no one has acted with an intent to punish" the appellant, but rather acted to preserve "safety, good order, and discipline, and treat all residents of the confinement facility equally." While the appellant's ability to attend religious services outside of the confinement facility was curtailed, the appellant was a regular participant in a Bible study group that met regularly in the confinement facility. TC separated from the military and departed the local area in October 2011; there were 14 Sundays after she separated where the appellant was not able to attend church services. The military judge concluded the Government had a legitimate interest in separating him from an alleged victim, but there was no Governmental interest in preventing him from attending services after she left the service. The military judge determined because the appellant would "only go to services every other week at most," he had only missed seven services and therefore awarded the appellant an additional seven days of credit.[12]

We defer to a military judge's findings of fact unless they are clearly erroneous. *United States v. Mosby*, 56 M.J. 309, 310 (C.A.A.F. 2002). The military judge's findings of fact as listed above are not clearly erroneous. We review de novo the legal question as to whether an appellant is entitled to additional confinement credit under Article 13, UCMJ. *United States v. Williams*, 68 M.J. 252, 256 (C.A.A.F. 2010). The appellant argues he is entitled to an additional 21 days of credit under R.C.M. 305(k). R.C.M. 305(k) provides that a "military judge may order additional credit for each day of pretrial confinement that involves an abuse of discretion or unusually harsh circumstances." *See United States v. Adcock*, 65 M.J. 18 (C.A.A.F. 2007). Here, the military judge awarded a full day of credit for the denial of attendance at a church service outside of the confinement facility. There were no findings of fact regarding the length of the service, but it is doubtful the service lasted the entire day. *Cf. United States v. Zarbatany*, 70 M.J. 169 (C.A.A.F. 2011) (additional credit granted when appellant who was a "model prisoner" was in virtual lockdown status 23 hours a day, denied appropriate

---

[11] The military judge originally stated that Senior Airman TC objected to the appellant's attendance at church. He later changed that finding in his written findings but did not change his conclusion.

[12] The military judge awarded a total of 18 additional days of credit, which he then added to the appellant's credit for 202 days in pretrial confinement for a total of 220 days pretrial confinement credit.

hygienic services, and denied mental health counseling, inter alia). We conclude the appellant is entitled to no more than the seven days additional credit he received on this issue.

*Verbatim Record of Trial*

A complete record of trial is required in a general court-martial when the sentence includes a punitive discharge or confinement in excess of the jurisdictional maximum of a special court-martial. Article 54(c)(1)(A), UCMJ, 10 USC § 854(c)(1)(A); R.C.M. 1103(b)(2)(B); *See United States v. Santoro*, 46 M.J. 344 (C.A.A.F. 1997). R.C.M. 1103(b)(2)(D)(v) requires appellate exhibits to be part of the record of trial.

A substantial omission from the record of trial renders it incomplete. *See United States v. Donati*, 34 C.M.R. 15 (C.M.A. 1963). "Whether an omission from a record of trial is 'substantial' is a question of law that we review de novo." *United States v. Stoffer*, 53 M.J. 26, 27 (C.A.A.F. 2000) (italics omitted). A record of trial may be complete and verbatim if the omissions are insubstantial. *United States v. Henry*, 53 M.J. 108, 111 (C.A.A.F. 2000) (record was complete even though four prosecution exhibits were omitted from the record because the omission was not substantial as the rest of the record of trial incorporated the information contained therein); *United States v. Barnes*, 12 M.J. 614 (N.M.C.M.R. 1981) (omission from the record of questionnaires completed by members prior to voir dire did not make record incomplete as omission was insubstantial), *aff'd on other grounds*, 15 M.J. 121 (C.M.A. 1983). *Cf. United States v. McCullah*, 11 M.J. 234, 237 (C.M.A. 1981) (prosecution exhibit that was prima facie evidence omitted from record was substantial omission and left the record incomplete); *United States v. Abrams*, 50 M.J. 361, 364 (C.A.A.F. 1999) (failure to attach personnel records of witness to record, which trial judge reviewed, but did not release to the defense, was substantial). We analyze whether an omission is substantial on a case-by-case basis. *Abrams*, 50 M.J. at 363. The omission of rulings or evidence which affect an appellant's rights at trial render appellate review impossible and are substantial omissions. *Id.* at 363; *United States v. Gray*, 7 M.J. 296, 298 (C.M.A. 1979) (omission of sidebar conference involving a ruling by the trial judge that affected the appellant's rights was substantial).

"[A] substantial omission renders a record of trial incomplete and raises a presumption of prejudice that the [G]overnment must rebut." *United States v. Harrow*, 62 M.J. 649, 654 (A.F. Ct. Crim. App. 2006). The Government may rebut the presumption by reconstituting the omitted portion of the record. *United States v. Harmon*, 29 M.J. 732 (A.F.C.M.R. 1989). "The main reason for a verbatim record is to ensure an accurate transcript for purposes of appellate review." *Id.*

The original record of trial did not include Appellate Exhibit LXXVI, which was the military judge's written ruling on the defense motion for pretrial confinement credit,

and Appellate Exhibit LXXVII, the protective order issued by the military judge. The military judge orally made his findings of fact, conclusions of law, and ruling on the record in regards to the defense motion for pretrial confinement credit. He also stated on the record that he was sealing the Mil. R. Evid. 412 motion and associated documents and identified the appellate exhibits which were to be placed under seal. Because all this information is included in the transcript, the omission of the written rulings and order is not substantial.

Furthermore, Government counsel obtained an affidavit from the military judge and both of the appellate exhibits. The military judge identified that his written ruling, Appellate Exhibit LXXVI, had one fact different than the facts announced on the record, but that this did not change his ruling. Even if the omission was substantial, the Government has rebutted the presumption of prejudice by reconstituting the omitted portion of the record. Appellate review of the ruling on pretrial confinement is possible and was conducted above.

*Sentence Reassessment*

This Court has "broad discretion" when reassessing sentences. *United States v. Winckelmann*, 73 M.J. 11, 12 (C.A.A.F. 2013). Our superior court has often held that if we "can determine to [our] satisfaction that, absent any error, the sentence adjudged would have been of at least a certain severity, then a sentence of that severity or less will be free of the prejudicial effects of error." *United States v. Sales*, 22 M.J. 305, 308 (C.A.A.F. 1986). This analysis is based on a totality of the circumstances with the following as illustrative factors: dramatic changes in the penalty landscape and exposure, the forum, whether the remaining offenses capture the gravamen of the criminal conduct, whether significant or aggravating circumstances remain admissible and relevant, and whether the remaining offenses are the type that we as appellate judges have experience and familiarity with to reliably determine what sentence would have been imposed at trial. *Winckelmann*, 73 M.J. at 15-16.

In this case, the landscape penalty has not changed dramatically. The appellant faced a maximum sentence of dismissal, 77 years of confinement, and forfeiture of all pay and allowances. The set aside of the false official statement changes the maximum confinement allowed to 72 years. Trial counsel argued for 10 years of confinement. The evidence of the false statements made to Det. DH would still be relevant and admissible as evidence made by the appellant regarding the offenses against JS. During the interview, the appellant confirmed some parts of JS's allegations and made several other inconsistent statements. Additionally, evidence of the false nature of the statement would have been independently admissible because CS would have still testified that she made an accusation against the appellant in January 2010 to SFS. The remaining offenses are the type of offenses with which we have experience and familiarity in determining sentence appropriateness. Based on this totality of the circumstances in this court-

martial, we are satisfied that absent the error, the members would have adjudged no less than the approved sentence of a dismissal, 5 years of confinement, and a reprimand.

*Conclusion*

The Third Additional Charge and its Specification is set aside and dismissed. The remaining findings and sentence, as reassessed, are correct in law and fact, and no error materially prejudicial to the substantial rights of the appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c). Accordingly, the remaining findings and sentence, as reassessed, are

AFFIRMED.

FOR THE COURT

LEAH M. CALAHAN
Deputy Clerk of the Court